## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

MARSBY TRIBUE, JR.  and ESSIE TRIBUE,
jointly and severally,

    Plaintiffs,

vs.              Case No.: 3:04cv286/RV/EMT

DEPUTY STEVEN HOUGH, individually

    Defendants,

_____/

### <u>ORDER</u>

Pending is the Defendant's motion for summary judgment (Doc.  15).

In this Section 1983 action, plaintiffs Marsby Tribue, Jr., and Essie Tribue allege that defendant Deputy Steven Hough unreasonably seized their residential property in violation of the Fourth Amendment when the property was  demolished in order to abate a public nuisance. The defendant now moves for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Unless otherwise noted, the following facts appear to be undisputed.[1]

I. **BACKGROUND**

Plaintiffs Marsby and Essie Tribue were husband and wife and, at one time,

---

[1]  The plaintiffs have failed to respond to defendant's summary judgment motion, and have failed to provide a statement of disputed facts in accordance with Local Rule 56.1.  Although a failure to respond may constitute grounds for granting the motion, [<u>See</u> N.D. Fla. Loc. R. 7.1(C)(1)], I will address the merits of defendant's motion by reviewing the entire record, including the depositions, affidavits, and exhibits submitted by the defendant. However, unless the record plainly reflects otherwise, all material facts set forth in the statement filed by the defendant will be deemed to be admitted because the plaintiffs have failed to controvert them by filing a statement of disputed facts.  <u>See</u> N.D. Fla. Loc. R. 56.1(A).

jointly owned real property in Okaloosa County, Florida.[2]  The real property included a residence and a toolshed/garage. Sometime in 1991, Essie Tribue moved to Chipley, Florida, but continued to stay at the Okaloosa County property on the weekends.  In June of 1992, Marsby Tribue moved out of the house and relocated to Quincy, Florida.  For the next few years, he visited the house occasionally on weekends, but he did not personally visit the property after 1997.

In 1996, Essie Tribue allowed a tenant to use the house, but her tenant refused to pay her any rent the entire time that he lived at the property.  Eventually in 1997, the tenant vacated the premises after being jailed on drug charges. Notwithstanding her relocation, Essie Tribue apparently continued to make mortgage payments on her Okaloosa County property.  Further, Essie Tribue stated that in 1999 she went to church in Okaloosa County almost every other weekend, and she continued to check on her house from time to time. However, as of 1999, no one had lived in or occupied the house for at least two years.

Defendant Steven Hough is a deputy with the Okaloosa County Sheriff's Office and serves as an investigator and member of the Community Policing Unit ("CPU") of the Sheriff's Office.  The CPU works together with residents within specified neighborhoods in order to improve living conditions and reduce crime within the area. In addition to the traditional methods of law enforcement, such as arresting criminals involved in illegal activities and policing the neighborhood, the CPU also performed non-traditional activities like assisting citizens in obtaining improved governmental services or in removing public nuisances. The plaintiffs' residence was located in the Sylvania Heights neighborhood, one of the neighborhoods included in the CPU's coverage.

Sometime in 1999, the CPU received several complaints from residents living near the plaintiffs' property that the vacant and rundown condition of plaintiffs'

---

[2] The plaintiffs were married at all times relevant to this complaint, but they divorced in 2003.

property created a crime hazard for the neighborhood. Apparently, the street intersection near the plaintiffs' property was notorious for the sale of illegal narcotics, and the illegal activity was facilitated by the plaintiffs' nearby abandoned building and vehicles.

Deputy Hough explained that the property was abandoned at the time in which he started receiving complaints from residents in the area, and the house was very dilapidated.  There were several junked, inoperable automobiles, as well as an old dump truck, in the yard of the property, and the yard was badly overgrown and strewn with debris.  The roof of the residence had fallen in, and grass was actually growing on the carpet inside the residence.[3]  All of the windows had been broken out, although most of them had been boarded back up.  Despite the boarded-up windows, access could be easily gained to the inside of the house, and the interior appeared to be regularly used for drug transactions and drug use. Deputy Hough was also aware of several arrests that had been made on the plaintiffs' property and inside the abandoned house.

In response to the numerous complaints about the plaintiffs' property, Deputy Hough contacted Deputy Ken Williams, who worked for the Environmental Enforcement section of the Okaloosa County Sheriff's Office.  In 1999, Deputy Williams had been responsible for handling environmental enforcement issues for the Sheriff's Office for more than ten years.  Thus, Deputy Hough asked Deputy Williams for assistance in dealing with the plaintiffs' property.   Since the Environmental Enforcement section was a small unit and had to deal with an already full case load, Deputy Williams did not handle the nuisance abatement issue on the plaintiffs' property himself.   Instead, Deputy Williams provided Deputy

---

[3] Essie Tribue stated that she had previously called a roofer about making repairs to the house.  According to Essie Tribue, the roofer met her at the property sometime in 1999 and gave her an estimate for fixing the roof.  Essie Tribue disputes the condition of the house, stating that the only real damage to the house was the roof, and that the windows were not broken out in 1999.

Hough with example documents which he had previously used in proceeding to abate a public nuisance, and he advised Deputy Hough about the standard procedure the Sheriff's Office generally followed.  Deputy Williams stated that in the fall of 1999, he also asked an Okaloosa County building official to visit the Tribue's property with him.

On September 15, 1999, in accordance with the advice received from Deputy Williams, Deputy Hough sent a certified letter to Essie Tribue advising her of the dangerous condition and the serious health and safety hazards existent on her Okaloosa County property.  The certified letter was sent to Essie Tribue's address in Cottondale, Florida, which Deputy Hough located as the official address for tax purposes in the Property Appraiser/Tax Collector's office.  Although Marsby Tribue was also legally a part owner of the property, no separate notice was sent to him.

According to the signed receipt for the letter, Essie Tribue received it on September 21, 1999.  The notice received by Essie Tribue identified numerous nuisances which existed on the plaintiffs' property, including: garbage and trash throughout the property; a dilapidated shed and vehicles offering harborage for rodents; an uninhabitable and deteriorating structure with portions of the roof fallen into the interior, and other parts which continued to rot and were in danger of falling; a structure that offered refuge for vagrants in the area and was an attractive nuisance for children, as evidenced by graffiti on the inside walls; and an area in front which was known for narcotics activity, as persons parked in front of the structure to conduct their illegal business.  The letter also ordered Essie Tribue to make certain corrections within thirty (30) days, and warned that if the corrections were not made, a motion to abate the nuisance would be filed for a "county cleanup."

In response to Deputy Hough's letter, Essie Tribue, along with her daughter Michelle Kent, attempted to make some corrections within the thirty-day period,

but the abandoned vehicles were not removed and no repairs to the home itself were made.  Ms. Kent called Deputy Hough after she and her mother had attempted some clean-up of the property, but Deputy Hough advised her that their response to his letter was inadequate because there had been no attempt to repair or remove the dilapidated house and shed.  Further, the abandoned vehicles were still in the back yard.  It is unknown whether Deputy Hough advised Ms. Kent, at that time, that he intended to file a petition to abate the nuisance.

Nevertheless, Deputy Hough determined that the property was still a nuisance and health hazard, and on November 2, 1999, he filed a "Petition for Relief of Health Hazard and Sanitary Nuisance" in the County Court for Okaloosa County.  The petition included a copy of the certified letter previously sent to Essie Tribue, notifying her of the dangerous condition of the property, copies of ten photographs showing the dilapidated condition of the property, and a proposed Order Providing Health Hazard Abatement.  The proposed order declared that pursuant Section 386.041, Florida Statute, and Okaloosa County Ordinance 91-1, the condition on the plaintiffs' property constituted a health hazard and public nuisance.[4]  Further, the proposed order compelled Essie Tribue to abate the sanitary nuisance found on her property by 5:00 p.m. on November 30, 1999.  In the event that Essie Tribue did not abate the nuisance within the stated deadline, the proposed order required Okaloosa County to abate the nuisance "in the most time expedient and cost effective manner possible."  The proposed order also appears to have combined the language of a motion as well as an order.  The relevant operative language provided as follows:

"Provision of the requested order include:
1)      A certified letter to Essie Tribue to be sent to 1723 Jarous Rd., Cottondale, Florida advising her/them to abate all nuisances

---

[4] §386.041, Fla. Stat., titled "Nuisances Injurious to Health," sets forth certain conditions which constitute prima facie evidence of a public nuisance. §386.041(1)(a)-(f).

before November 30, 1999 5:00 p.m.

2)      Should the nuisances fail to be abated on or before the above mentioned date and time, Okaloosa County is ordered to abate the sanitary nuisance in the most time effective and cost effective manner possible.

*      *      *

5)      A copy of this Motion to abate nuisance shall be sent to Essie Tribue, at the address of 1723 Jarous Rd. Cottondale, Florida via certified mail."

Deputy Hough did not send a copy of his petition to either of the plaintiffs. On November 4, 1999, two days after Deputy Hough's petition was filed, a Circuit Judge signed the proposed "Order Providing Health Hazard Abatement" prepared by Deputy Hough.  The abatement order was entered ex parte, and no hearing was scheduled or held.  Deputy Hough did not send Essie Tribue either a letter advising her to abate the nuisance or a copy of his motion.  Instead, Deputy Hough explained that he believed the Office of the Clerk for Okaloosa County would send a copy of the signed abatement order to Essie Tribue in accordance with established Clerk of Court procedures.  Therefore, he relied on the Clerk's Office to provide the plaintiffs with notice of the potential demolition of their residential property.  However, the plaintiffs contend that they did not receive a copy of the signed order to abate the nuisance.  Therefore, the plaintiffs claim that they were unaware of the November 30 deadline imposed by the Circuit Court.

By late March of 2000, Deputy Hough determined that the nuisance on the plaintiffs' property still existed, and that the plaintiffs had failed to take any corrective action.  Thus, on April 4, 2000, (six months after entry of the abatement order), Deputy Hough and Deputy Williams accompanied personnel from the Okaloosa County Road Department to the plaintiffs' property.  Deputy Hough and Deputy Williams stood by while the Road Department personnel demolished the buildings and removed all of the abandoned vehicles.

While Deputy Williams was watching the nuisance abatement proceed, Michelle Kent, the plaintiffs' daughter, arrived at the residence and asked why the county officials were removing the structures and vehicles on the property.  When Deputy Williams explained that it was in order to abate a nuisance, Ms. Kent asked the deputies to stop the process.  However, Deputy Williams advised Ms. Kent that it was too late, and the demolition would proceed as planned.

The plaintiffs' son, who also lives in the same neighborhood where the property is located, was on his way to work on April 4, 2000, when he saw the bulldozers in front of the property. He immediately called his mother to inform her of the situation.  Her son also obtained Deputy Williams' mobile phone number, and Essie Tribue called Deputy Williams while he was on the property assisting with the demolition.  Essie Tribue asked Deputy Williams why he was tearing her house down, and he advised her that it was pursuant to a court order.  She informed him that she still had a mortgage on the property, and she asked him to stop the abatement process immediately.  However, Deputy Williams also advised Essie Tribue that it was too late and the demolition would proceed as planned.  As a result, Essie Tribue told Deputy Williams, "I'll see you in court," and hung up the phone.

The plaintiffs amended complaint contained eight counts, including an action for inverse condemnation, breach of an implied contract, enforcement of vendor's lien, improper exercise of police power, unreasonable seizure of property, declaratory relief, negligence, and conversion.  In my prior order, I dismissed all of the plaintiffs' state law claims because the plaintiffs had failed to meet Florida's three-year statutory deadline for maintaining a cause of action against a subdivision of state government.  See Order, dated December 20, 2004 (citing §768.28(6)(b), Fla. Stat. (2004)).  Further, I dismissed the claims against Sheriff Morris and Okaloosa County because the plaintiffs failed to plead any basis for establishing municipal liability under Monell v. New York City Dept. of Social Services, 436 U.S.

658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).  All of the plaintiffs' federal claims were dismissed, except the plaintiffs' Fourth Amendment claim against Deputy Hough.  Now, Deputy Hough moves for summary judgment against the plaintiffs with respect to the remaining Fourth Amendment claim.

## II.   DISCUSSION

### A.   Summary Judgment Standard

A motion for summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(c), Fed. R. Civ. P.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265, 273 (1986).  See also Morisky v. Broward County, 80 F.3d 445, 447 (11th Cir. 1996).

However, summary judgment is improper "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995).  An issue of fact is "material" if it might affect the outcome of the case under the governing law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202, 211 (1986).  It is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  Id. See also Matsushita Electric Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

Conclusory allegations based on subjective beliefs are insufficient to create a

genuine issue of material fact.  See Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000); Ramsey v. Leath, 706 F.2d 1166, 1170 (11th Cir. 1983). On a summary judgment motion, the record and all reasonable inferences that can be drawn from it must be viewed in the light most favorable to the non-moving party.  Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999).

  B. Fourth Amendment Claim

  The plaintiffs claim that the defendant violated their Fourth Amendment rights by unreasonably seizing their property.  The Fourth Amendment of the United States Constitution provides, in pertinent part, that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . ."  U.S. Const.  amend. IV.  Thus, to establish a Fourth Amendment violation, the plaintiffs must prove that there was in fact a seizure of their property, and the seizure was unreasonable.  Regarding the first element, a seizure occurs when there is some meaningful interference with an individual's possessory interest in property. Soldal v. Cook County, Ill., 506 U.S. 56, 60, 113 S.Ct. 538, 121 L.Ed. 2d 450 (1992). Thus, where drastic measures occur, such as the demolition of an old residential building or the removal and destruction of old abandoned vehicles, the nuisance abatement qualifies as a seizure within the scope of the Fourth Amendment.[5]  See Freeman v. City of Dallas, 242 F.3d 642, 647-48 (5th Cir. 2001) ("There can be no question that [the demolition of the plaintiff's apartment buildings] constituted a seizure."); Debari v. Town of Middleton, 9 F.Supp. 2d 156, 161 (N.D.N.Y. 1998)("Where, as here, the government demolishes a building, a 'seizure' results within the meaning of the Fourth Amendment.").

  Whether the seizure of the plaintiffs' property was reasonable is the next inquiry. The Fourth Amendment "reasonableness" standard carefully balances

_____

[5] The Fourth Amendment's protection extends to the civil context as well as the criminal.  Soldal v. Cook County, supra, 506 U.S. at 67, 113 S. Ct. at 546.

governmental versus private interests.  United States v. Gordon, supra, 231 F.3d at 754.  Considerations such as the "'scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted'" are important factors in determining the reasonableness of any governmental seizure.  Gilmere v. City of Atlanta, Ga., supra, 774 F.2d at 1502(citing Bell v. Wolfish, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884, 60 L. Ed. 2d 447 (1979)).  The Supreme Court of the United States has explained that "reasonableness depends not only on when a seizure is made, but also how it is carried out." Tennessee v. Garner, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985).

        With these guiding principles in mind, a determination of reasonableness involves looking at the totality of the circumstances surrounding the seizure.  In the nuisance abatement context, the governmental justification for seizing the property is to protect the health and welfare of its citizens from a public nuisance.  Therefore, the governmental interest is an important one, and the government does not violate the Fourth Amendment unless it carries out the seizure in a manner that is unreasonable given the circumstances of the particular case.  Other courts have analyzed whether a nuisance abatement was "carried out" in a reasonable manner by examining whether the property owners were afforded procedural due process before the destruction of their property, and whether any other unreasonable or arbitrary municipal actions are shown. Manganaro v. Reap, 2002 WL 229492 (3rd Cir. 2002);  Freeman v. City of Dallas, supra, 242 F.3d at 652-53; Samuels v. Meriwether, 94 F.3d 1163, 1168 (8th Cir. 1996); Santana v. City of Tulsa, 359 F.3d 1241 (10th Cir. 2004).

        Absent exigent circumstances requiring immediate demolition of property, the law is well settled that the property owner must be afforded notice and an opportunity to be heard before the municipality takes the drastic step of abating the nuisance by complete destruction. Manganaro v. Reap, supra, 2002 WL 229492;

Freeman v. City of Dallas, supra, 242 F.3d at 652-53; Thomas v. City of Dallas, 175 F.3d 358 (5th Cir. 1999); Samuels v. Meriwether, supra, 94 F.3d at 1168; Santana v. City of Tulsa, supra, 359 F.3d at 1241. See also, Grayden v. Rhodes, 345 F.3d 1225 (11th Cir. 2003).  The notice must reasonably convey the required information, including the pendency of the action and that the property owner will have an opportunity to be heard. Id. (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). "This right to be heard has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to appear or default, acquiesce or contest." Mullane, supra, 339 U.S. at 314, 70 S. Ct. at 657.

Apart from notice, procedural due process generally requires that a hearing before an impartial decision maker be provided at a meaningful time, and in a meaningful manner, prior to a governmental decision which deprives individuals of a liberty or property interest.  Mathews v. Eldridge, 424 U.S. 319, 332-3, 96 S.Ct. 893, 901-2, 47 L. Ed. 2d 18 (1976).  In the case of a municipality's decision to demolish property in order to abate a nuisance, the property owner must be afforded the right to present evidence and assert reasons why "a proposed action should not be taken." Cleveland Bd. Of Educ. v. Loudermill, 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed. 2d 494 (1985); Accord, Freeman, supra, 242 F.3d at 654; Santana, supra, 359 F.3d at 1244; Samuels v. Meriwether, supra, 94 F.3d at 1167.  In addition to procedural due process considerations, another important factor under the "reasonableness" standard is whether the municipality's actions were otherwise arbitrary or reasonably necessary. Accordingly, in Samuels v. Meriwether, supra, 94 F.3d at 1167-68, the Eighth Circuit rejected the defendant's assertion that if procedural due process is provided, nothing else is required to satisfy the reasonableness requirement of the Fourth Amendment.

Here, the defendant argues that he is entitled to qualified immunity regarding his conduct in abating the nuisance in this case.  Qualified immunity shields a

government official in his individual capacity from civil liability under certain circumstances.  In order to be entitled to qualified immunity, a defendant must have been acting within the scope of his discretionary authority.  Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004). If he was, then the plaintiffs must show not only that a constitutional violation occurred, but also the plaintiffs must show that the plaintiff's rights were clearly established at the time the defendant committed the allegedly wrongful conduct.  Id.(citing Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct.  2151, 150 L.Ed.  2d 272 (2001)).

I previously denied the defendant's qualified immunity defense in my prior order addressing his motion to dismiss, and the defendant has offered no additional evidence to establish that he is entitled to qualified immunity now.  At the time of the seizure, the constitutional requirements for abating a nuisance were clearly established.  For example, it was clearly established that the government, absent exigent circumstances, must afford a property owner with both reasonable notice and an opportunity to be heard when private property interests are at stake. Mathews v. Eldridge, supra, 424 U.S. 319, 96 S.Ct. 893; United States v. James Daniel Good Real Property, 510 U.S. 43, 48 (1993); Fuentes v. Shevin, 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L. Ed.2d 556 (1972); Mullane v. Central Hanover Bank & Trust Co., supra, 339 U.S. 306, 70 S.Ct. 652.  See also, Rowland v. State ex rel. Martin, 129 Fla. 662, 176 So. 545, 546-47 (1937)("before private property may be condemned and destroyed in the exercise of police power, except in cases of emergency, there must be an opportunity for the owner or occupant to be heard and an orderly determination of the issue as to whether or not the property is subject to condemnation under reasonable police regulations.")

At the time of the alleged conduct, it was also clearly established that a state cannot constitutionally destroy property to abate a public nuisance unless complete destruction was reasonably necessary.  Traylor v. City of Amarillo, supra, 492 F.2d at 1160.  See also, Goldblatt v. Town of Hempstead, supra, 369 U.S. at

594-95, 82 S.Ct. at 990.  Similarly, the Supreme Court of Florida cautioned, "(t)he absolute destruction of property is an extreme exercise of the police power and is justified only within the narrowest limits of *actual necessity*, unless the state chooses to pay compensation.  Corneal v. State Plant Bd., supra, 95 So.2d at 4.

Several disputed factual issues preclude summary judgment based upon qualified immunity.  For example, a question still remains regarding whether the plaintiffs received notice or whether a copy of the signed abatement order would have constituted "adequate" notice, even if the plaintiffs did receive a copy.  Further, the necessity of the demolition of the property is still in dispute.  Although the photographs of the plaintiffs' property constitute strong evidence that the residence was very dilapidated and in need of substantial repairs, the ex parte nature of the abatement order does not allow this court to determine what factors, if any, the defendant considered in concluding that demolition was reasonably necessary.[6]  Thus, under the circumstances of this case, there exists a genuine issue of material fact as to whether the seizure of the plaintiff's property was reasonable or unreasonable.

     C.    Quasi-Judicial Absolute Immunity

The defendant also asserts that he is protected by absolute quasi-judicial immunity because he was simply executing the directions of the abatement order.  A party claiming absolute immunity, such as quasi-judicial immunity, bears the burden of establishing justification for such immunity.  Roland v. Phillips, 19 F.3d 552, 555 (11th Cir. 1994)(quoting Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 432, 113 S. Ct. 2167, 2169, 124 L. Ed. 2d 391 (1993)).  Generally, law enforcement officers acting in furtherance of their official duties and relying on a

---

[6] Deputy Williams also testified that the building official did not believe the house was repairable.  However, the defendant did not submit an affidavit of the building official.  Since Deputy Williams' account of the building official's statement constitutes hearsay, it cannot be considered for summary judgment purposes in evaluating whether the house was actually repairable.

facially valid court order are entitled to absolute quasi-judicial immunity. Id. at 556. See also, Valdez v. Denver, 878 F.2d 1285,1288-89 (10th Cir. 1989)).

However, the extent of absolute quasi-judicial immunity to which a law enforcement officer may be entitled is limited by the circumstances and the conduct which the plaintiff challenges.  One limitation is that the "law enforcement officer's fidelity to the specific orders of the judge marks the boundaries for labeling acts 'quasi-judicial'." Richman v. Sheahan, 270 F.3d 430, 436 (7th Cir. 2001)(citing Martin v. Bd. of Commissioners, 909 F.2d 402, 405 (10th Cir. 1990)). See also, In re Foust, 310 F.3d 849, 855 (5th Cir. 2002); Roland, supra, 19 F.3d at 555 (holding that law enforcement personnel must be acting within the scope of their authority in order to be entitled to absolute immunity.)

Here, it is undisputed that a nuisance abatement order was entered which declared the plaintiffs' property to be a health and safety hazard, and the defendant was directed by the order to abate the nuisance in the "most time expedient and cost effective manner possible."  However, the specific terms of the abatement order are garbled. For example, the language of the abatement order addresses a "certified letter" which will be sent to Essie Tribue, as well as a copy of the motion to abate the nuisance which will be sent certified mail.  The defendant asserts that he relied on the clerk of court's office to mail the plaintiffs a copy of the signed abatement order.  While the defendant may have justifiably relied on the clerk's office to do that, it is unclear from the abatement order itself whether the order actually directed the defendant to send a certified letter and a certified copy of the motion, in addition to a copy of the signed abatement order.  The defendant would not be entitled to absolute quasi-judicial immunity where he did not follow the explicit directions of the abatement order.  Since the precise terms of the abatement order are confusing, summary judgment for the defendant is not appropriate based on quasi-judicial absolute immunity.

D.    Availability of Post-deprivation State Law Remedies

The defendant also argues that even if the seizure of the plaintiffs' property was unreasonable, the decision of the Supreme Court of the United States in Parratt v. Taylor, 451 U.S. 527, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981) precludes the plaintiffs from pursuing a Section 1983 case since adequate post-deprivation state law remedies were available to the plaintiffs.   Contrary to the defendant's assertion, however, Parratt does not stand for the broad proposition that the availability of all section 1983 claims depends on the exhaustion of state judicial or administrative procedures.   Gilmere v. City of Atlanta, supra, 774 F.2d at 1499.   Section 1983 claims involving a violation of an enumerated constitutional right are substantively different from those based solely on Fourteenth Amendment due process.  Id. (citing Parratt, supra, 451 U.S. at 536, 101 S. Ct. at 1913). Thus, the existence of state tort remedies is no bar to the direct assertion of a Fourth Amendment violation.  Id. at 1502.

The defendant mistakes the plaintiffs' claim as strictly a procedural due process challenge.   However, the ultimate determination in a Fourth Amendment claim is the reasonableness of the seizure.   While considerations of whether the property owner was afforded procedural due process are relevant in determining whether the seizure was reasonable, procedural due process is not the only consideration.   Freeman, supra, 242 F.3d at 654; Santana, supra, 359 F.3d at 1244; Samuels v. Meriwether, supra, 94 F.3d at 1167.

Furthermore, the availability of state law post-deprivation remedies bears relevance only where the challenged act can be characterized as random and unauthorized, thereby making pre-deprivation process infeasible. Zinermon v. Burch, 494 U.S. 113, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990). In this case, the defendant argues that he followed the established procedure of the Okaloosa County Sheriff's Office.   For example, the defendant explained that when determining how to handle the nuisance on the plaintiffs' property, he consulted

Deputy Williams, who had been dealing with nuisance abatement procedures for the Sheriff's Office for over ten years, and Deputy Williams provided the defendant with sample documents which the Sheriff's Office had used on previous occasions.[7]

In Zinermon v. Burch, supra, 494 U.S. 113, 110 S. Ct. 975, the Supreme Court of the United States held that the Parratt doctrine does not apply, and post-deprivation remedies are insufficient, when the deprivation is foreseeable, pre-deprivation process is practicable, and the state official's conduct is not "unauthorized". Here, the seizure of the plaintiffs' property was not only foreseeable, but it was planned.  Given the fact that exigent circumstances did not exist requiring immediate demolition, pre-deprivation process was possible and practicable, and the defendant's conduct was not "unauthorized" because he followed standard departmental policy.  In Carcamo v. Miami-Dade County, 375 F.3d 1104, 1106 (11th Cir. 2004), the Eleventh Circuit noted that the acceptability of post-deprivation process turns on the *feasibility* of the pre-deprivation process, as opposed to the existence of a policy or practice.  However, it also recognized that generally when conduct is taken pursuant to an established procedure, pre-deprivation process is feasible and the Parratt doctrine is inapplicable. Id. at 1106 n.4.  See also, Zimmerman v. City of Oakland, 255 F.3d 734, 739 (9th Cir. 2001)(holding that Parratt did not foreclose a due process challenge to the

---

[7] Generally, a determination that a defendant's conduct was not "random and unauthorized" also resolves the issue of potential municipal liability. Under Monell v. New York City Dept. of Social Services, supra, 436 U.S. at 691, 98 S.Ct. at 2036, Section 1983 liability will apply to a municipality or state agency if the act complained of was taken "pursuant to official municipal policy of some nature [which] caused a constitutional tort."  However, I previously dismissed the Sheriff's Office and Okaloosa County as defendants because the plaintiffs' amended complaint failed to identify any county policy or custom that caused the constitutional injury. See Order, dated December 20, 2004, p.22.  In fact, the amended complaint failed to even allege that the defendant acted pursuant to a county policy.

Case 3:04-cv-00286-RV-EMT   Document 21   Filed 01/06/06   Page 17 of 17

Page 17 of  17

adequacy of the procedures under which the removal of nuisance automobiles was carried out); Kennedy v. Village of Oak Lawn, 2000 WL 1721044 (N.D. Ill. 2000)(holding that Parratt does not preclude Section 1983 liability where demolition of property is pursuant to established procedure, and no exigent circumstances exist, because pre-deprivation process is practicable and feasible). Accordingly, in this case, the fact that adequate state post-deprivation remedies were available to the plaintiffs does not entitle the defendant to summary judgment on the plaintiffs' federal Section 1983 claim.

E.   Negligence

Finally, the defendant argues that his conduct cannot rise to the level of a constitutional violation because, at most, the evidence establishes that he was merely negligent.   Negligent or innocent mistakes do not violate the Fourth Amendment. Maughon v. Bibb County, 160 F.3d 658, 660 (11th Cir. 1998). Further, negligence on the part of government officials generally does not give rise to a section 1983 action. Daniels v. Williams, 474 U.S. 327, 330-31, 106 S.Ct. 662, 665, 88 L.Ed. 2d 662 (1986).  Nevertheless, taking the facts in the light most favorable to the plaintiffs, a jury could find that the defendant's conduct constituted more than mere negligence.  There are still disputed issues of material fact pertaining to any alleged negligence of not only the defendant, but also the clerk of court (and possibly others) which may have contributed to the plaintiffs' lack of notice.   Thus, to the extent that the defendant argues he is entitled to summary judgment because his conduct only constituted negligence, the defendant's summary judgment motion must also be denied.

III.   CONCLUSION

For all of the above reasons, the defendants' motions for summary judgment (Doc.  15) is DENIED.

DONE AND ORDERED this 6th day of January, 2006.

/s/ Roger Vinson
**ROGER VINSON**
**Senior United States District Judge**